Filed 6/27/14  P. v. Arnold CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057683 |
| v. | (Super.Ct.No. FVI1101852) |
| MICHAEL JOHN ARNOLD, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  John M. Tomberlin, Judge.  Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Steve Oetting and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I.  INTRODUCTION

Defendant, Michael John Arnold, age 32, engaged in consensual sex with 16-year-old Jane Doe.  He was convicted of unlawful sexual intercourse (Pen. Code, § 261.5) and oral copulation with a person under 18 (Pen. Code, § 288a, subd. (b)(1)).

On appeal, he contends the trial court erred in allowing into evidence a description of the contents of a magazine found in a chest of drawers in his bedroom.  He further submits that various e-mail communications between himself and Doe were erroneously admitted into evidence because they were not properly authenticated.  Lastly, he argues the court abused its discretion in not inquiring further of Juror No. 7 as to whether he could be fair and impartial after defendant struck up a conversation with the juror during a break, while both were in the bathroom.  We find no error.

A description of the contents of the "Lollypop" magazine were admissible under Evidence Code section 1101, subdivision (b)[1] as to the issues of motive and identity.  The e-mail communications were authenticated under sections 1420 and 1421.  Lastly, the court did not abuse its discretion in refusing to inquire further of Juror No. 7 as to whether he could be fair and impartial, following the bathroom discussion which was begun by defendant.

---

[1] All further statutory references are to the Evidence Code unless otherwise indicated.

## II.  FACTS

In July 2011, Doe was 16 years old and lived with her mother and stepfather in Victorville.  She and her mother were very close.

On July 25 or 26, Doe was on the Internet looking for a babysitting job.  She found a listing on Craig's List from an anonymous person seeking a babysitter.  Doe responded to the listing.  She stated she was 16 years old and if the person was still looking, she was interested in the job.  Doe received a response from a different e-mail address—one with an address of "mikejmotorbreath10@yahoo.com"; in the e-mail it was indicated that the person was still looking for a babysitter.  At some point the communication between Doe and the person changed to text messaging.  The person indicated he did not really need a babysitter but if Doe needed cash, they could work something out.  Doe believed the man wanted something of a sexual nature and she was "willing to go along with whatever."  The two decided that she should come to his house for a job interview.

On July 29, Doe told her mother that she had found a listing for a babysitting job on Craig's List and asked her mother to drive her to a house in Hesperia for a job interview.  Her mother agreed to drive and accompany Doe to the interview because her mother was "[v]ery skeptical" about the listing.

They arrived at the home in Hesperia in the early afternoon.  Defendant met Doe and her mother at the door and invited them into the house.  Doe's mother and defendant spoke for about an hour while Doe played with defendant's eight-month-old son.

3

Defendant said he worked nights for the railroad, that his wife recently left him, and he needed someone to watch his infant son and do some light housekeeping while he slept. Defendant's three- or four-year-old daughter was taken care of by her grandparents. In that Doe looked older than her age, Doe's mother told defendant that Doe was a minor. By the end of the conversation Doe's mother felt comfortable leaving Doe at defendant's house. Before she left, she asked Doe if Doe was comfortable staying at defendant's house; Doe said she was. Doe's mother agreed to let defendant drive Doe home after Doe finished working.

After walking Doe's mother outside, defendant returned to the house and sat on the sofa with Doe as they talked. Defendant touched Doe and the two started kissing. Defendant gave Doe three $20 bills for what Doe thought was about to happen. Thereafter, the two moved to a bedroom. After they undressed, defendant laid on top of her, kissed her, and grabbed her breasts. Defendant moved his way down her body with kisses and then orally copulated her.

He eventually penetrated her vagina with his penis, which Doe testified "really hurt." Doe described it as "[t]he kind of pain that makes your body feel like it's being ripped apart." Doe attempted to scoot away from defendant, but did not tell him to stop. Eventually, they stopped and dressed. Doe noticed blood on the comforter. Defendant asked her if she was "on [her] period," to which Doe responded, "no." This was the first time Doe had had sexual intercourse.

4

Defendant drove the victim home around 4:00 or 5:00 p.m. After arriving home, Doe, without meeting up with her mother, quickly gathered some belongings and left for Wrightwood with a friend.

A few days after the incident and beginning August 1 at 11:15 p.m., and continuing over the next 12 hours, defendant and Doe corresponded by way of e-mail. Doe directed her e-mails to "mikejmotorbreath10@yahoo.com," the same e-mail address that she had used before the incident. Initiating the correspondence, Doe asked if she could visit defendant and his children so she could get to know them better.

Defendant responded in an e-mail indicating: "Yeah, tomorrow maybe. Let me get back to you. I got home from work, picked up the kids. Now I got to get all of us to bed. I'll email you in the morning. Good morning, sweetheart." Doe e-mailed back: "I have a doctor's appointment tomorrow. So I probably can't make it, but I want you so bad right now. I want you to fuck me. I'll talk to you tomorrow."

Defendant replied: "Hey, good morning, sweetheart. Thanks for the message. I loved reading it. Just remember my much older and large cock will be deep inside you soon. I promise to fuck your young pussy really well, baby. All right. Just hang in there a little longer. In the meanwhile, please play with your pussy and maybe try and shove something in it. It needs to be used to largeness. It's just too much of a tight fit for my huge dick right now. Thanks, sweetheart." Doe wrote back that she would follow his advice, and to let her know if he had "any more tips for" her. Defendant responded that he had another tip, and provided a link to a video clip; Doe did not open the link because

5

she read it, and did not want to see it. She responded with an e-mail asking if that was something he would like to try; she indicated it looked painful.

Defendant e-mailed back with a link and indicated: "This clip here, I will teach you how to do." Doe did not click on the link, but responded: "Um, okay. [¶] . . . [¶] . . . Thanks. Let me know when you're available." Defendant replied, indicating that he was available at that time and suggested that he take Doe to her doctor's appointment and then home. Doe responded: "Oh, I want to so badly, but my mom wants to take me. I will be home alone the majority of the day though if you still have time."

Doe and defendant kept conversing back and forth. He wrote that they were "secret lovers," and maybe they could "become even more." He wrote that he really liked her, and was glad that he could teach her "sex the right way." Doe asked: "What do you mean by even more? I completely understand this is a secret. Trust me. I'm, glad you can teach me too."

Defendant replied: "I was just thinking that what if we end up falling for each other. You never know, sweetheart." Doe wrote back: "I don't want to sound like an ass, but you are older than me. I just want to find a boy who can love me. Sorry." Defendant indicated that he understood, and she should consider him her teacher. Doe then asked if he had any additional tips, things he would like her to try. Defendant replied: "If you would shave your pussy."

Doe testified that she wanted to see defendant, as she liked the attention and felt flattered. She had only had one boyfriend. It was during her freshman year, and nobody

6

had paid any attention to her since that time. She had friends, but she "was like untouchable." She felt like no guys liked her. No older man had ever approached or paid attention to her.

At 1:00 p.m. on Monday, August 1, Doe went to her therapy appointment, at which time she told her therapist about the incident with defendant. The police were called.

San Bernardino County Deputy Sheriff Scott Nobles took a report at the Hesperia station regarding the incident. The perpetrator was identified as a person named "Mike." Officer Nobles initially interviewed Doe and her mother. Doe indicated she had gone on Craig's List looking for a babysitting job, and found one at defendant's house. Her mother drove her to the house. After her mother left, "Mike" told her she was very pretty, and he started coming on to her. He kissed her, laid her down on the bed, took her clothes off, took his own clothes off, and then he kissed and licked her vagina and had sexual intercourse with her. Doe said she did not want to have sex with him, but she was afraid and scared; she wanted it to be over so she did not put up a fight or tell him to stop. She said she went to the house to babysit, and she did not know that they were going to have sex.

Officer Nobles felt that Doe was not being forthright, so he asked her if she had any other contact with defendant. Doe said they had been communicating by e-mail. Officer Nobles asked to look at the e-mails; Doe indicated she had deleted them. After

7

Doe gave him the password to her e-mail account, Officer Nobles looked in the trash file, and saw the e-mails between Doe and defendant. He printed them.

Upon confronting Doe with the e-mails, she admitted she had been a willing participant in the acts, and that she and defendant communicated by e-mail about the sexual acts he wanted to perform on her, and that she was a willing participant. Doe said her main reason for going to the house was to have sexual intercourse with defendant. She indicated the babysitting story was to get her mother to give her a ride. Officer Nobles wrote a report indicating that Doe had been involved in a consensual encounter with Mike, and that she continued to communicate with him afterwards.

Doe testified that when speaking to Officer Nobles she initially described the incident as "nonconsensual." She "[p]robably" used the word "rape" in reporting the incident. However, she had lied. After Officer Nobles read the e-mails, Doe thought she was stupid, and realized she could have "potentially ruined somebody's life" by being too afraid to speak up, and instead accused someone of rape. She then felt obligated to tell the truth, which she did. Although at trial Doe testified that she could not recall whether defendant was circumcised, she told Officer Nobles that defendant was not circumcised.

On the morning of August 9, a search warrant was served at the house identified by Doe as the place where the incident occurred. Detective Michael Guiffredo made contact with defendant's wife, who stated she lived at the house. After being called on the telephone, defendant returned home and was taken to the Hesperia police station. Upon being placed in handcuffs, defendant indicated to Detective Guiffredo that it had

8

been awhile since he had been in handcuffs, and that it had been for the same type of thing, and that one would think he would have learned his lesson.

During an initial search of the residence, Detective Guiffredo found a magazine titled "Lollypop," which depicted adult women as teenagers, some mail, and bed sheets with blood on them. The magazine was in a dresser drawer in the master bedroom. Detective Guiffredo described the magazine as being pornographic, depicting adult females in different poses dressed in clothing to suggest they were "teenagers or choir leaders, that type of subject." Detective Guiffredo did not find the comforter that Doe had described. Later that day, after defendant's wife called him, he returned to the residence and located the comforter in a dumpster in front of the house. A large piece of it had been cut out and was missing. Detective Guiffredo later showed the comforter to Doe, which she recognized as the one that had been on the bed.

Mary Jo Vollmer-Sandholm, a forensic pediatric nurse practitioner employed by the Loma Linda University Children's Hospital and the Children's Assessment Center, testified that she conducted two physical examinations of Doe The first took place on August 10, 2011.

At the time of the examinations, Doe told Vollmer-Sandholm about the encounter with defendant. During the physical examination, Vollmer-Sandholm found evidence of trauma to the genital area. The hymen was completely missing at the edge, and there was granulation tissue due to elongation. Vollmer-Sandholm found some healing tissue along the edge. The tear was significant because in 80 to 90 percent of cases, there will be no

9

noticeable injury, as the genitals are mucous membranes and heal extremely quickly. Based on the injury, Vollmer-Sandholm estimated that penetration occurred sometime between five days to a month prior to the examination, which was consistent with what Doe had reported. According to Vollmer-Sandholm, the injury could only have been caused by penetration of the vagina with something like a penis. It would have caused bleeding and been painful, as it would have required a significant amount of force to tear the hymen from top to bottom. There was nothing to indicate that what Doe told her did not occur. Her findings were consistent with the incident occurring on July 29.[2]

A. *Section ll08 Evidence*

Nicole M. was born in October 1986. She met defendant when she was 15 and he was 23. Defendant was a friend of Nicole's sister and her sister's husband; defendant would come over to their house and watch movies and drink. In 2002, Nicole and defendant began a relationship. One evening, Nicole and defendant started talking after Nicole told defendant that she thought he was cute. Eventually, they went to defendant's parents' house where they had sexual intercourse and oral sex. Their sexual relationship continued from the time she was 15 until she was almost 17. She had sex with defendant almost every night, and oral sex with him a couple of times a week. Their relationship was consensual, and Nicole was a willing participant.

---

[2] Vollmer-Sandholm also testified that Doe had a history of depression, suicidal ideation, self-mutilation, and abuse.

10

About five months into the relationship, Nicole's parents found out about it. The police were called. In 2003, defendant pled guilty to unlawful sexual intercourse. (Pen. Code, § 261.5, subd. (c).)

B. *Defense*

Defendant testified. He indicated that on July 29, the date Doe stated she had sex with him, he left his home in Hesperia for work about 1:45 p.m. and clocked into his job in Barstow at 2:47 p.m. He denied he had ever seen or conversed with Doe and her mother. He did not have sexual intercourse with Doe on any day between July 25 and August 1. He testified he did not have an e-mail address at the time of the incident and that he was not the "Mike" referenced in the e-mail address. He further stated that his wife threw the comforter in the trash because it was torn. His spouse gave him the Lollypop magazine. At no time did he make the admission that was attributed to him by Detective Guiffredo. He was circumcised at birth.

Defendant further testified he was working on July 28 and 29. He also worked on July 25. He did not work on July 27, and does not recall if he was working on July 26.

Relative to his relationship with Nicole, defendant testified that he stopped having sex with her when he found out she was only 17 years old. Further, he never orally copulated Nicole. While he did sign a plea agreement, the signature on the plea agreement submitted into evidence was not his.

11

C. *Rebuttal Case*

Detective Guiffredo testified he interviewed Doe on August 3, 2011. He had her look at a calendar and she indicated that she thought the incident occurred on July 27 or possibly July 20.[3]

### III. DISCUSSION

A. *There Was No Error in Admitting Into Evidence a Description of the Contents of the "Lollypop" Magazine*

During an initial search of defendant's residence, Detective Guiffredo found an adult magazine titled Lollypop in a chest of drawers in defendant's bedroom. As testified to, the magazine depicted adult females in different poses dressed in clothing to suggest they were "teenagers or choir leaders, that type of subject."

Before the start of trial, defendant objected to the admission into evidence of the magazine and its contents. The objection was twofold: (1) the magazine depicted photographs of individuals over 18 years of age, and thus could not be characterized as child pornography and had no bearing on a crime committed on a victim under the age of 18; and (2) the crimes for which defendant was charged were not malum in se crimes, and thus had no relevance as to the issue of defendant's intent. As a result, counsel argued, the magazine and its contents had no probative value and under section 352 should have been excluded from evidence because it was highly prejudicial. In response,

---

[3] During the prosecution's case-in-chief, Doe testified it could have occurred on Thursday, July 28, rather than Friday, July 29.

the trial court indicated: "I think what we've got is [section] 1101[, subdivision] (b) evidence . . . . I think it tends to show something about motive, intent, preparation, plan, knowledge, absence of mistake or accident. I think it has all of those earmarks. I don't think it's unduly prejudicial. I think it is highly probative on those issues, and for that reason, I'm going to allow it."[4]

Under section 1101, subdivision (a): "[E]vidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion." Notwithstanding subdivision (a), evidence of an act is admissible if it is "relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . .)" (§ 1101, subd. (b)) and its probative value is not substantially outweighed by its undue prejudice (§ 352). "On appeal, a trial court's ruling under . . . sections 1101 and 352 is reviewed for abuse of discretion." (*People v. Lewis* (2001) 25 Cal.4th 610, 637.) That is, the trial court's decision must not be capricious or arbitrary and must be guided and controlled by fixed legal principles in conformity with the spirit of the law. (See *People v. Ortiz* (2003) 109 Cal.App.4th 104, 117.)

Here, the character evidence or act in question is the possession of the Lollypop magazine. We look first to its relevance under section 1101, subdivision (b).

---

**4** The magazine was placed in a sealed envelope and admitted into evidence as exhibit 16; the jury was not allowed to view the contents of the magazine. The cover of the magazine was copied and admitted into evidence as exhibit 14.

We agree with defendant that possession of the magazine was not relevant for purposes of showing intent. Here, defendant was charged with violations of Penal Code sections 261.5 and 288a, subdivision (b)(1). Both are general intent crimes. (*People v. Singh* (2011) 198 Cal.App.4th 364, 367.) Because both crimes are general intent crimes as opposed to specific intent crimes, evidence of a prior act is not admissible on the issue of intent under Evidence Code section 1101, subdivision (b). In *People v. Scheer* (1998) 68 Cal.App.4th 1009, the defendant was charged with felony hit and run (Veh. Code, § 20001, subd. (a)), a general intent crime. (*People v. Scheer, supra,* at p. 1014.) The trial court admitted into evidence under Evidence Code section 1101, subdivision (b) facts of a prior conviction for evading an officer (Veh. Code, § 2800.2). (*People v. Scheer, supra,* at p. 1016.) On appeal, the defendant contended that the prior flight evidence was irrelevant as to the defendant's intent at the time of the present offense. The appellate court agreed. "[W]e find the prior flight evidence was not admissible to show intent. 'Evidence of *intent* is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense.' [Citation.] Intent, which pertains to the defendant's state of mind, is not an element of a general intent offense. The prior flight evidence was not admissible to show appellant's intent since felony hit and run (Veh. Code, § 20001) is a general intent crime." (*Id*. at p. 1019.) As here, both charges against defendant were general intent crimes. Defendant's state of mind in engaging in the conduct is not of relevance; as such, possession of the Lollypop magazine has no bearing on the issue.

14

With this said, we do believe evidence pertaining to the Lollypop magazine was relevant to the issues of motive and identity.  Here, defendant denied doing the acts complained of.  He went so far as to testify that he had never seen Doe or her mother prior to the time of trial.  As such, his identity as the perpetrator was clearly at issue. "[M]otive for a crime is never an issue in its own right, but may operate as a basis to establish *identity* on the rationale that the defendant's possession of a *reason* (motive) to commit the charged offense increases the likelihood that he did so. . . .  [¶]  . . . [I]t is relevant only insofar as it tends circumstantially to increase the likelihood that defendant, rather than another, committed the charged offense. . . . The question is *in what conduct* is defendant sexually motivated to engage?"  (*People v. Earle* (2009) 172 Cal.App.4th 372, 392-393; see also *People v. Scheer, supra,* 68 Cal.App.4th at pp. 1017-1018 ["Motive is an intermediate fact which may be probative of such ultimate issues as . . . identity . . . ."].)  Here, defendant denied being the perpetrator.  Clearly his possession of the Lollypop magazine, depicting women as teenagers in a sexually explicit manner, had a tendency to support the conclusion that he was in fact the perpetrator of sexual crimes involving a teenager.  It supports the notion of what sexual conduct he is motivated to engage in, thus supporting the inference that he was the perpetrator that engaged in the conduct with Doe.[5]

---

[5] It must also be noted that although defendant had not testified at the time that the evidence concerning the magazine came before the jury, such evidence would have probably been independently admissible for purposes of impeachment.  On direct examination the defendant testified as follows:  "Q. [Defendant], on July 29th, 2011, did you have sexual intercourse with [Doe]?  [¶]  A.  No, that's disgusting."  Certainly, his

*[footnote continued on next page]*

Thus, the trial court did not abuse its discretion in finding relevance as to defendant's possession of the magazine and its contents. Further, there was no undue prejudice caused by its admission. There does not appear to be anything unlawful or inflammatory about possessing a magazine which depicts adults posing as teenagers; in light of the entire record, defendant's possession of the magazine was probably the most benign piece of evidence offered against him.

B. *The E-mails Between Defendant and Doe Were Properly Authenticated*

Defendant contends the e-mails between himself and Doe were inadmissible because they were not properly authenticated. He argues that there was no evidence that he had an e-mail account or address of mikejmotorbreath10@yahoo.com. He further submits that there was no evidence that he authored the e-mails or received any of Doe's e-mails. We disagree.

Under section 1401, before a writing or evidence of its content may be admitted into evidence, the writing must be authenticated. Authentication is nothing more than evidence establishing that the writing is what the proponent claims it to be. (§ 1400.) Pursuant to section 1412, a writing may be authenticated by evidence other than through the testimony of the subscribing witness. "A writing may be authenticated by evidence that the writing was received in response to a communication sent to the person who is

*[footnote continued from previous page]*
possession of the Lollypop magazine would have a tendency to contradict his statement that having sexual intercourse with a teenager is disgusting. We, of course, recognize that had evidence concerning the magazine not been initially admitted into evidence, defendant may not have testified as he did.

16

claimed by the proponent of the evidence to be the author of the writing." (§ 1420.). And, "[a] writing may be authenticated by evidence that the writing refers to or states matters that are unlikely to be known to anyone other than the person who is claimed by the proponent of the evidence to be the author of the writing." (§ 1421.).

"[T]he proponent's burden of producing evidence to show authenticity [citation] is met 'when sufficient evidence has been produced to sustain a finding that the document is what it purports to be. [Citation.]' . . . 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility. [Citations.]' [Citation.] '"[L]ike any other material fact, the authenticity of a [document] may be established by circumstantial evidence. . . ."' [Citation.]" (*People v. Valdez* (2011) 201 Cal.App.4th 1429, 1435.) Here, there was ample evidence that the e-mails attributed to "mikejmotorbreath10@yahoo.com" were those of defendant. Without detailing all of the corroborating evidence, it is clear that Doe received at least one e-mail from the subject address prior to going to defendant's house. When she and her mother arrived at the house, the testimony shows that defendant was there and that he discussed babysitting with Doe's mother, a topic which had been discussed by Doe and defendant prior to Doe and her mother going to the house. After Doe's mother left there was obviously no ambiguity as to the reason why Doe was at defendant's address. It is therefore clear that the person communicating with Doe prior to the incident was defendant. After the incident, Doe testified that she contacted the same e-mail address as

before the incident. The discussions back and forth in the postincident e-mails demonstrate that the person communicating with Doe was indeed the same individual that had sexual intercourse with Doe. Finally, when the police took defendant into custody, they did so at the same residence where the incident occurred.[6]

C. *The Trial Court Did Not Err in Failing to Sufficiently Inquire of Juror No. 7 as to Whether He Could Be Fair and Impartial*

At a break during closing arguments, defendant, while in the bathroom, initiated a conversation about the case with Juror No. 7. Defendant contends his due process right to an impartial jury was violated because the trial court failed to inquire of Juror No. 7 as to whether he could be fair and impartial following defendant's conversational overtures. We find no error.

Upon learning of the conversation, the court inquired of Juror No. 7 outside the presence of the other jurors. As stated by Juror No. 7: "I was in the rest room, going to the rest room. The defendant came up next to me. He said, This is stressful, and I said, I bet it is. Then he asked, You guys don't—no. He said, What do you guys think so far? I wrote it down after I came in. He said, What do you guys think so far? I go, I'm not allowed to talk about it. He goes, Yeah. Yeah, I know. Then he said, You don't think I committed this—I think he started to say despicable thing, but I cut him off again and said, I really can't talk about it. Then when I said I couldn't talk about it, you know, I

---

[6] Save and except for defendant's testimony, the entire record circumstantially supports the notion that the e-mail address belonged to defendant and that it was he who was in correspondence with Doe.

was, like, I wish I could, but I can't. [¶] He finished, turned around, went to wash his hands. He said, I have proof. I have documents proving that I was not there on that day, and then he said, I can tell you one thing, at the end of this, I'm going to find out who the people are that are involved. Then he walked out."

After Juror No. 7 left the courtroom, the court remanded defendant into custody "based upon what is clearly conduct that he knows is inappropriate and attempting to influence this jury outside of court . . . ." After the lunch break, counsel for defendant asked the court to recall Juror No. 7 "to make sure he's still able to sit and be fair and impartial." The court refused, indicating that there were no remaining alternates, it didn't seem that the juror was prejudiced against defendant, and that it really isn't of concern because it was defendant's conduct that created the situation. No motion for mistrial was made on behalf of either party.

While defendant frames the issue as juror misconduct, it clearly is not. The misconduct was by defendant. As stated in *In re Hamilton* (1999) 20 Cal.4th 273, 305: "[W]e question whether a convicted person can ever overturn the verdict on grounds that persons *acting in his behalf* deliberately sought to influence the jury. Certainly no such claim could ever be valid where the *accused himself* had instigated the incident; a party cannot profit by his or her own wrongdoing." In the same vein is *People v. Williams* (1988) 44 Cal.3d 1127. There, the jury in a capital murder case returned a verdict of guilty in the guilt phase of the trial. While still in the jury box and prior to beginning the penalty phase, the defendant mouthed to the jurors: "'"'I'm going to get each and every

19

one of you mother fuckers."'" (*Id.* at p. 1155.) A few days later, and just as the jurors were returning with their verdict in the penalty phase, the incident was brought to the court's attention. "After the verdict was read, defense counsel requested individual voir dire in order to determine whether the comment had been discussed during the penalty deliberations. The court noted that defendant should not benefit from his own wrongdoing and denied the request." (*Id.* at pp. 1155-1156.) In addressing the issue, the Supreme Court indicated: "Evidence obtained by jurors from sources other than in court is misconduct and constitutes grounds for a new trial if the defendant has been prejudiced thereby. [Citation.] It is not clear, however, that such a rule applies to the jurors' perceptions of the defendant, particularly when the defendant engages in disruptive or otherwise improper conduct in court. As a matter of policy, a defendant is not permitted to profit from his own misconduct." (*Id.* at p. 1156; see *People v. Hendricks* (1988) 44 Cal.3d 635, 643 [error claimed for failing to declare a mistrial after the defendant in open court burst out that he was guilty of six murders. "[A] defendant may not be heard to complain when, as here, such prejudice as he may have suffered resulted from his own voluntary act."].)

While we agree with the Supreme Court's comment in *Williams* that "[w]hen a court perceives that the jury has been exposed to extraneous material, it is the court's duty to ascertain the nature of that evidence and its effect on the jurors' ability to deliberate impartially" (*People v. Williams, supra,* 44 Cal.3d at p. 1156), we cannot say that the court's failure to do so here was an abuse of discretion. From the record, it

20

appears that only Juror No. 7 knew of the substance of the conversation and that one other juror knew that defendant had said something to Juror No. 7. Defendant's affirmative comments, while inappropriate, were in no way threatening to Juror No. 7, and in essence reiterated the testimony received during trial that defendant was at work at the time of the incident.

The evidence of guilt was extremely strong. The comments made by defendant to Juror No. 7 were relatively innocuous. On this record, there exists no basis to conclude that it is substantially likely that defendant's comments affected the verdict or in some fashion biased a juror. (See *In re Carpenter* (1995) 9 Cal.4th 634, 655.)

IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING             <br>Acting P. J.

We concur:

MILLER           
                        J.

CODRINGTON      
                        J.

21